UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JEREMY JENNINGS,

        Plaintiff,

                              Case No. 13-cv-13560
                              Honorable Gershwin A. Drain

v.

MONROE COUNTY, *et al.*,

        Defendants.

_____/

## OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [#27]

## I.    INTRODUCTION

On August 19, 2013, Plaintiff Jeremy Jennings filed the instant action raising discrimination and retaliation claims under the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101 *et seq.*(Counts I and II), as well as a Fourteenth Amendment claim under 42 U.S.C. § 1983 (Count III) stemming from his termination as the Assistant Director of Monroe County E 9-1-1 Service District (hereinafter "Central Dispatch") in May of 2012.  In addition to Central Dispatch, Plaintiff brings his claims against Monroe County and the five members of Central Dispatch's Board of Directors who voted to terminate Plaintiff's employment--Tilman Crutchfield, Thomas Moore, Daniel Donahue, Robert Neely and Larry Buckingham.

Presently before the Court is the Defendants' Motion for Summary Judgment, filed on August 27, 2014.  The motion is fully briefed and a hearing was held on November 18, 2014.  For the reasons that follow, the Court will grant Defendants' Motion for Summary Judgment.

## II.    FACTUAL BACKGROUND

Plaintiff began his employment with Central Dispatch in 1999. Central Dispatch handles all of the emergency calls for Monroe County. It is governed by a board of directors consisting of various county law enforcement officials and citizen members appointed by the Monroe County Board of Commissioners. At the time of Plaintiff's termination, Defendant Tilman Crutchfield, the Monroe County Sheriff, was the chairman of the board.

Plaintiff began his employment with Central Dispatch as a communications specialist. He was promoted to Assistant Director in 2008. As Assistant Director, Plaintiff was responsible for the efficient day-to-day operation of the Central Dispatch Communication Center. He was also responsible to be on-call in the event any employee or equipment issues or emergency situations occurred. Plaintiff was second in command; his supervisor was Alan Frank, the Director of Central Dispatch. As an employee of Central Dispatch, Plaintiff was required to follow the Code of Conduct, which states in relevant part:

3.      Employees shall not be participants in any incident involving moral turpitude that causes Monroe County Central Dispatch to be brought into disrepute, impairs the efficiency of Monroe County Central Dispatch, or impairs their ability to properly perform their duties.

4.      Employees shall not knowingly violate any laws of the United States, State of Michigan, ordinance of a unit of local government, laws of any other state, or an order of any court.

                    *                        *                        *

10.     Employees shall not possess or consume any kind of intoxicating beverage while on duty. Off duty, members shall not use intoxicants to the extent that any evidence of such consumption is apparent when reporting for scheduled duty.

*See* Defs.' Mot., Ex. 18.

Frank did not perform formal work evaluations during Plaintiff's employment, however prior to the events occurring on April 10, 2012 and April 11, 2012, which led to Plaintiff's termination,

-2-

Frank believed that Plaintiff's work performance was satisfactory for the most part. He had never issued any formal disciplinary actions against Plaintiff and also recommended that he receive a pay raise. However, Frank did notice that approximately two weeks prior to April 10, 2012, Plaintiff was arriving to work late and appeared tired. Plaintiff had also missed two important radio training sessions and requested time off on short notice. Additionally, a few weeks prior to April 10, 2012, Frank was informed by the Fire Department's Chief that he had observed Plaintiff driving a Central Dispatch vehicle in an unsafe manner with the emergency lights on even though there was no emergency at that time. Lastly, during the previous year, Frank was informed by a probation officer that Plaintiff had acted belligerently at the scene of an automobile accident involving Plaintiff's stepdaughter.

In July of 2011, Plaintiff began treating with a psychologist, Richard Rizzo, Ph.D. In early 2011, Plaintiff filed a whistleblower lawsuit against Monroe Township because he had been demoted from his position as a lieutenant volunteer for the Monroe Township Fire Department. Plaintiff claimed he was demoted because he had reported some illegal activities by the Fire Department's Chief. Plaintiff asserts that the resulting stress surrounding these events caused him to seek treatment with Dr. Rizzo. Dr. Rizzo diagnosed Plaintiff as suffering from post-traumatic stress disorder ("PTSD") stemming from childhood sexual abuse. Dr. Rizzo noted the condition was "severe: Due to work conflict he has lost self esteem and feels anxious and depressed." *See* Plf.'s Resp., Ex. 2 at 11. Dr. Rizzo's treating notes show that Plaintiff treated with him on nearly a weekly basis between July of 2011 through February of 2012. *Id.* at 1-49.

Plaintiff claims he informed Frank of his treatment and diagnosis of PTSD prior to April 11, 2012. However, he does not recall the date that he told Frank this information, nor does he remember any specific details that he discussed with Frank concerning his PTSD. If such a

conversation in fact took place, Frank has no recollection of it.  At his deposition he was asked if

he knew if Plaintiff was receiving medical treatment during his employment at Central Dispatch.

He responded: "I'm not aware of any medical call – or any medical care other than he had indicated

to me that he was having potentially a prostate problem he was being treated for but other than that

discussion, no other medical treatment that I'm aware of."  *See* Defs.' Mot., Ex. 2 at 21.

On April 5, 2012, Plaintiff separated from his wife and began living at his mother's

apartment.  On April 10, 2012, Plaintiff and his wife went to a marriage counselor concerning the

couple's marital problems, which included an on-going issue concerning Plaintiff's suspicions about

his wife's infidelity, as well as Plaintiff's involvement with a Monroe County employee.  Dr. Amber

Lang's progress notes from that session indicate that Plaintiff "reports significant distress due  to

recent separation from [his] wife and due to recent recall of childhood abuse.  Reports increased

drinking, increased fighting, increased nightmares, increasing anxiety, and increasing intrusional

thoughts."  *See* Plf.'s Resp., Ex. 5 at 4.

After the counseling session, Plaintiff and his wife went back to the marital home and

continued to discuss their issues.  Plaintiff became more agitated because he was "convinced his

wife was going to tell him she wanted to return to her previous boyfriend."  He drank a pint of

Tequila, as well as took a Xanax pill that his mother had given to him and quickly became

intoxicated.  After the Plaintiff left, his wife was concerned and contacted a family friend, Dundee

Police Sergeant Bret Ansel around 11:15 p.m. Ansel had counseled Plaintiff and his wife two days

earlier concerning their ongoing marital problems.

Plaintiff's wife contacted Ansel again around 3:15 a.m. on April 11, 2012.  She indicated that

Plaintiff was in his car in her driveway, was texting her and wanted to come inside. When Ansel

arrived, Plaintiff drove off in a careless and reckless manner.   Ansel was in a private vehicle and

believed it was unsafe to try and catch up with Plaintiff's car.   During the ensuing hours, Ansel and Plaintiff continued to communicate through text messaging, and Ansel became increasingly concerned that the Plaintiff was going to take his own life.   Ansel decided to involve Central Dispatch and the Dundee Police Department was alerted.   Officers were dispatched to join in the search for Plaintiff.

Around 5:00 a.m., Ansel was able to locate Plaintiff, who had driven to his mother's apartment. Due to the alcohol and Xanax consumption, Plaintiff has no recollection of driving from the marital home to his mother's apartment.   Ansel and another Dundee Police Officer woke Plaintiff and spoke with him.   Plaintiff claims he knew that he needed to seek professional help and sent an email to his supervisor, Frank, and asked for three days off.

Frank was called around 5:45 a.m. and was informed that there was a potential issue with the Assistant Director.   Thereafter, Frank contacted Ansel who told him that Plaintiff had been experiencing marriage problems and had "gone off the deep end in a big way."   *See* Def.'s Mot., Ex. 3, Dep. Tr. of Alan Frank at 23.   Ansel further explained that Plaintiff had made suicidal statements and had placed a barrel of a gun in his mouth.

After Ansel left Plaintiff's mother's apartment, Plaintiff decided that he wanted to see his infant daughter.   He drove over to his mother-in-law's house where the child was, but his mother-in-law had been warned to prohibit him from coming inside.   She called the Monroe County Sheriff's Department and Sergeant John Plath was dispatched to the house. He spoke to Plaintiff and then called his wife, who recommended that Plaintiff admit himself to the University of Michigan Hospital.   Plaintiff agreed and Plath transported him to the University of Michigan Hospital, where he was admitted for suicidal ideation.

On April 13, 2012, Frank emailed Plaintiff and advised him that he was being placed on

administrative leave and would be required to submit to a fitness for duty examination. Plaintiff responded to Frank's email the next day. He informed Frank that he was doing much better and would be home by April 16, 2012. The discharge summary from the University of Michigan stated that Plaintiff was suffering from a mood disorder not otherwise specified ("NOS"). *See* Defs.' Mot., Ex. 8 at 1. The summary also notes that "r/o SIMD" meaning the hospital's doctors could not rule out whether Plaintiff's mood disorder was substance induced. The hospital noted that Plaintiff had a history of PTSD but concluded his symptoms were "subclinical" at the time and that his "[j]udgment . . . is fair, but likely to be impaired outside of the hospital environment given substance use (alcohol, benzos)." Additionally, the hospital doctor opined that "marital strain," "acute work stress" and "ineffective coping" were also related to the psychiatric symptoms. The hospital released Plaintiff to return to work with no restrictions.

Once he was home on April 16, 2012, Plaintiff sent an email to Frank stating:

> Al, I am home. It is ok to release my check to Lisa. Lisa did show me the paperwork for short term disability. I have been released to do my normal activities.

> I do not see any need for medical or disability. I have enough vacation and personal time to cover my time off. I am seeing a doctor tomorrow who does a fitness for duty exam and I would be more than happy to follow up with anyone that HR would see fit. I am more than willing to meet with you and HR to move ahead.

*See* Plf.'s Resp., Ex. 7 at 8.

On April 17, 2012, Defendant Crutchfield sent an email to the Deputy Director of Human Resources for Monroe County, Aundrea Armstrong, inquiring about the job description for the Assistant Director of Central Dispatch and whether it was an at-will position. Armstrong responded:

> [Plaintiff] is at-will but it is not as simple as it seems to just let someone go. Especially if they have a medical issue. We will need to work through this and make sure we do what is best for the organization and the employee. We have taken the first steps in setting up the Fitness for Duty.

-6-

*See* Plf.'s Resp., Ex. 9 at 3.  Crutchfield responded to Armstrong's email and stated:

> Myself and Director Frank are of the same opinion that [Plaintiff] can not be allowed
> to return to his position.  Some other provision must be made to either reach a
> settlement agreement or find another position in county govt... I agree that it must
> be handled in steps but at the same time Al can not be expected to run Dispatch
> without an assistant . . . some provision must be made in the interim.

*Id*. at 3-4.

Plaintiff reported for his fitness for duty examination with Susan Casselman, Psy.D., in

Toledo, Ohio.  Dr. Casselman interviewed Plaintiff and administered the Minnesota Multiphasic

Personality Inventory 2 ("MMPI-2"), as well as spoke with Frank, Armstrong and Plaintiff's wife.

Dr. Casselman prepared a six page report on May 1, 2012.  Her report includes Plaintiff's and his

wife's versions of the episode in mid-April precipitating the fitness for duty examination.  Dr.

Casselman further indicated that the results of the MMPI-2 do not reveal Plaintiff was suffering from

psychosis or suicidal ideation.  Dr. Casselman opined  that the "incident does appear to be an

aberration caused in part by recent recollections of sexual and physical abuse, and a history of low

self-esteem."

Dr. Casselman recommended that Plaintiff be allowed to return to work after a one month

administrative leave.  She also recommended that he be given "light duty" at a different job site, if

possible.  She concluded that Plaintiff was not disabled, but needed to continue with individual

therapy on a weekly basis for at least six months.  Specifically, Dr. Casselman opined:

> I do not see Mr. Jennings as disabled.  However, he needs to continue with individual
> therapy on a weekly basis for at least six months.  Mr. Jennings should also undergo
> a battery of psychological tests to evaluate his level of stress and his coping
> strategies.  He should also undergo evaluation for psychotropic medication.

*See* Defs.' Mot., Ex. 6.  She concluded that "[i]f [Plaintiff] can handle the changes outlined above,

I believe he will be able to return to his previous job at some point in the future."

On April 28, 2012, Plaintiff was seen by Dr. Rizzo wherein Plaintiff told Dr. Rizzo that he felt he was ready to return to work but had not been cleared yet. Dr. Rizzo prepared a work leave of absence letter for Central Dispatch indicating that Plaintiff would be able to return to work on April 30, 2012, "with no restrictions including all law enforcement duties." *Id.* Despite Dr. Casselman's recommendations, Plaintiff did not return to weekly treatment with Dr. Rizzo. Between April 28, 2012 and July 19, 2012, Plaintiff saw Dr. Rizzo on two occasions. A July 5, 2012, entry in his medical records states that "Pt has missed at least four appointments and case to be closed if no further contact." *See* Plf.'s Resp., Ex. 2.

On May 8, 2012, Frank and Armstrong interviewed the Plaintiff. At the meeting, Plaintiff admitted drinking Tequila and taking Xanax on April 10, 2012. He could not admit or deny driving while under the influence because he claims that he blacked out around 10:00 p.m. through 6:00 a.m the following morning. The notes from the investigative interview indicate that the events of April 10, 2012 through April 11, 2012 were viewed by the administration as "extremely serious" and were the reason that Plaintiff had been put on administrative leave.

Plaintiff subsequently drafted a letter to Armstrong concerning the meeting. In his letter, Plaintiff explained that he had been diagnosed with PTSD in 2011. He also stated that he had been experiencing increased stress due to the whistleblower lawsuit and the deterioration of his marital relationship. This caused him to drink alcohol mixed with non-prescription medication after the counseling session with his wife on April 10, 2012. He further stated that he had been released to return to work "by a Team of Doctors at the University of Michigan, a therapist in Westland, and another Doctor from the University of Michigan." *See* Defs.' Mot., Ex. 17. Plaintiff concluded his letter by stating "[s]ince receiving treatment, my life has changed for the better drastically and I am and have been willing and able to return to work."

-8-

On May 11, 2012, the Central Dispatch Board held a special meeting.  At the meeting, Frank made a presentation recommending that Plaintiff's employment be terminated because he no longer had confidence in his second in command.  The minutes from the meeting state:

> Director Frank presented the Board an overview relating Assistant Director-Jennings administrative leave on-going since April 14, 2012.  The board was advised an administrative investigation has been conducted.  During the investigation, the Director had consulted with Human Resources and County labor counsel.  The director spoke to the responsibilities of Central Dispatch and Assistant Director's position.
> Director Frank spoke to the lack of confidence and trust he had in the judgment of the Assistant Director.  Director Frank advised he no longer had confidence in the Assistant Director and recommended [Plaintiff] be terminated.

*See* Plf.'s Resp., Ex. 12 at 2.  Plaintiff attended the meeting and took notes.  His notes state in relevant part:

> Director Frank advised that the Assistant Director was placed on administrative leave effective April 14, 2012.  Director Frank stated through out [sic] the process he counseled with Human Resources, Director Frank advised that it is the responsibility of the 911 Board to maintain a level of confidence and trust.  Director Frank advised that the Assistant Director was responsible for Discipline, technical and the day to day operations of the 911 Center.  Director Frank recommended to the board that the Assistant Director be terminated immediately for the best interest of the agency and the people that it serves.

*See* Plf.'s Resp., Ex. 16 at 3.  Plaintiff was offered an opportunity to discuss the matter in a closed session, but declined to do so.

As a result of the recommendation, the board voted 5 to 4 to accept Frank's recommendation and Plaintiff was terminated.  At his deposition, Frank explained his reasons for recommending that Plaintiff be terminated as his second in command:

> Th[e April 10, 2012 through April 11, 2012] incident, in investigating that incident, learning that he had drank intoxicants, learning he had taken medication not prescribed to him, learning that he had dr[iven] an automobile after duty in a manner that was excessive in prompting a police officer not to be able to keep up with him,

> and knowing that he had no recall from 9 in the morning, or from 9 in the evening, limited recall I believe is what he said, from 9 in the evening until 6:30 in the morning, and yet it's his responsibility to be here and on call and available for managerial duties, for county emergencies, those decisions, or those facts, . . . prompted my decision[.]

*See* Plf.'s Resp., Ex. 1 at 61.

On June 11, 2012, Plaintiff sent correspondence to Frank requesting a hearing to clear his name concerning the "reasons [the] Defendants stated Plaintiff[] was to be terminated." Compl., ¶ 11.  On June 26, 2012, the Central Dispatch Board held a meeting and voted to deny Plaintiff's request for a name clearing hearing.

On July 13, 2012, Plaintiff filed a complaint with the Equal Employment Opportunity Commission concerning his termination from Central Dispatch.  His complaint states:

> I began working for the above named employer on or about January 12, 1995 as a Communications Specialist.  My job title at the time of discrimination was Assistant Director.  I am an individual with a disability, and the employer is aware of my disability.
>
> On or about April 14, 2012 I was denied a return to work by the employer after seeking treatment for my disability.  On or about May 11, 2012 I was discharged from employment.
>
> I believe that I was discharged from employment because of my disability, in violation of the Americans with Disabilities Act of 1990, as amended.

*See* Defs.' Mot., Ex. 19.  Plaintiff received his right to sue letter on July 23, 2014.[1]  Compl., ¶16.

## III.   LAW & ANALYSIS

### A.      Standard of Review

---

[1]  This date appears to be incorrect and Plaintiff has not provided a copy of the Right to Sue Letter.  It appears that in response to Plaintiff's Complaint, the EEOC sent a letter to Plaintiff on July 19, 2012 requesting a statement from Plaintiff by August 9, 2012, as well as informing him that if he wished to participate in the mediation program, he had until August 2, 2012 to submit the necessary paperwork.  It seems odd that the EEOC would provide a right to sue letter on July 23, 2012 based on the July 19, 2012 letter's deadlines.

-10-

Federal Rule of Civil Procedure 56(a) empowers the court to render summary judgment forthwith "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *See Redding v. St. Eward*, 241 F.3d 530, 532 (6th Cir. 2001). The Supreme Court has affirmed the court's use of summary judgment as an integral part of the fair and efficient administration of justice. The procedure is not a disfavored procedural shortcut. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986); *see also Cox v. Kentucky Dept. of Transp.*, 53 F.3d 146, 149 (6th Cir. 1995).

The standard for determining whether summary judgment is appropriate is "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Amway Distributors Benefits Ass'n v. Northfield Ins. Co.,* 323 F.3d 386, 390 (6th Cir. 2003) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)). The evidence and all reasonable inferences must be construed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986); *Redding*, 241 F.3d at 532 (6th Cir. 2001). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986) (emphasis in original); *see also National Satellite Sports, Inc. v. Eliadis, Inc.*, 253 F.3d 900, 907 (6th Cir. 2001).

If the movant establishes by use of the material specified in Rule 56(c) that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law, the opposing party must come forward with "specific facts showing that there is a genuine issue for trial." *First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 270 (1968); *see also McLean v. 988011 Ontario, Ltd.*,

224 F.3d 797, 800 (6th Cir. 2000).  Mere allegations or denials in the non-movant's pleadings will not meet this burden, nor will a mere scintilla of evidence supporting the non-moving party. *Anderson*, 477 U.S. at 248, 252.  Rather, there must be evidence on which a jury could reasonably find for the non-movant. *McLean*, 224 F.3d at 800 (citing *Anderson*, 477 U.S. at 252).

### B.     ADA Claims

#### 1.     Discrimination under the ADA

The ADA provides that no covered entity shall discriminate against a qualified individual on the basis of disability.  42 U.S.C. § 12112(a). Plaintiff can establish a *prima facie* case of disability discrimination by showing that he: (1) is disabled within the meaning of the ADA; (2) he was qualified for the position; (3) suffered an adverse employment action; (4) his employer knew or had reason to know of his disability; and (5) his position remained open or that similarly situated employees were treated more favorably. *Brenneman v. Medcentral Health Sys.*, 366 F.3d 412, 418 (6th Cir. 2004); *Whitfield v. Tennessee*, 639 F.3d 253, 258-59 (6th Cir. 2011).  Defendants argue that Plaintiff cannot establish his *prima facie* case under the ADA because he was not disabled within the meaning of the ADA, nor can he show his employer knew or had reason to know of his purported disability.  Defendants also argue that even if Plaintiff can establish his *prima facie* case, he cannot demonstrate that Defendants' legitimate, non-discriminatory reason for terminating him was pretext for discrimination.

Under the ADA, a person is disabled if he has "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;" or (B) a record of such an impairment;" or (C) is "regarded as having such an impairment." 42 U.S.C. § 12102(1). It is well settled that the existence of a medical condition "does not qualify automatically as a disability simply because it is medically diagnosed or treatable." *Mulholland v. Pharmacia &*

-12-

*Upjohn*, 52 F. App'x 641, 645 (6th Cir. Nov. 22, 2002). "Major life activities" include "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(a).

The term "'substantially limits' shall be construed broadly in favor of expansive coverage, to the maximum extent permitted by the terms of the ADA. 'Substantially limits' is not meant to be a demanding standard." 29 C.F.R. § 1630.2(j)(1)(i). Whether a physical or mental impairment is substantially limiting depends on whether it renders the person with the impairment unable to perform a major life activity as compared to most people in the general population. 29 C.F.R. § 1630.2(j)(1)(ii). In making this determination, it may be useful to consider the nature and severity of the impairment, the duration or expected duration of the impairment, and the permanent or long term impact resulting from the impairment. 29 C.F.R. § 1630.2(j)(4)(i).

Plaintiff can establish he is "regarded as" having such an impairment if he was "subjected to an action prohibited under [the ADA] because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." 42 U.S.C. § 12102(3). Under the "regarded as" prong of the ADA, Plaintiff must show that his perceived impairment was the "but for" cause of the adverse employment action. *Banaszak v. Ten Sixteen Recovery Network*, No. 12-12433, 2013 U.S. Dist. LEXIS 81671, *14-15 (E.D. Mich. Jun. 11, 2013).

Based on the record before the Court, Plaintiff cannot establish a *prima facie* case of disability discrimination because he has failed to show he has a disability or that he was "regarded as" having a disability within the meaning of the ADA. Plaintiff argues that his mental impairment caused significant limitations in the major life activities of sleeping, concentrating, thinking and

-13-

working.  However, the record does not support his assertion.   To establish that the major life activity of working is substantially limited due to an impairment, Plaintiff must show, at a minimum, that he is "unable to work in a broad class of jobs."  *Lane v. Bell County Bd. of Educ.*, 72 F. App'x 389, 396 (6th Cir.  Aug. 12, 2003).  The inability to perform a single job does not amount to substantial limitation in the major life activity of working.  *Id.*

Plaintiff fails to point to any evidence in the record demonstrating he is "unable to perform a broad class of jobs."  At the hearing, counsel argued that Plaintiff's hospitalization demonstrates his substantial limitation with respect to the major life activity of working because he was unable to work while he was at the hospital in April of 2012.  However, Plaintiff failed to provide the Court with case law; nor has the Court found any authority, controlling or otherwise, that supports Plaintiff's theory that a single, short-term hospital admission can establish substantial limitation in the major life activity of working.

As to the major life activity of sleeping, the Sixth Circuit has held that:

> "[S]leeping between two and four hours per night, while inconvenient, simply lacks the kind of severity we require of an ailment before we will say that the ailment qualifies as a substantial limitation. . . . Further, even if we were to find that fewer than three hours of sleep per night amounts to a substantial limitation, [the plaintiff]'s uncorroborated testimony about his sleep habits is not enough to raise a genuine issue of material fact as to whether  his sleep was substantially limited.  *See Greathouse v. Westfall*, 212 F. App'x 379, 383 (6th Cir. 2006)(holding that general information from plaintiff and his doctors about his sleep problems, without more specific evidence, was insufficient to establish a substantial limitation.)

*Simpson v. Vanderbilt Univ.*, 359 F. App'x 562, 567 (6th Cir. Dec. 22, 2009).  Plaintiff likewise provides insufficient evidence of substantial limitation in the major life activity of sleeping.  While it is true that his medical records from Dr. Rizzo reveal that he had been experiencing trouble sleeping, this is insufficient under circuit precedent to establish substantial limitation in this major life activity.

-14-

Lastly, as to the major life activities of concentrating and thinking, Plaintiff fails to point to evidence that he is substantially limited in the major life activities of thinking and concentrating "compared to most people in the general population." 29 C.F.R. § 1630.2(j)(1)(ii).  Moreover, his deposition testimony belies his claim that he was substantially limited with respect to these activities, as well as his ability to perform his job duties as the Assistant Director of Central Dispatch.  Specifically, Plaintiff testified that:

> Q.   Now, would you agree with me that your work at 911 Dispatch was fine and that you were a good employee, diligent, et cetera –throw out the et cetera.
> Would you agree with me that your work at 911 Dispatch was fine, diligent, hard working, detailed, up till April 10th–
> A.   Yes.
> Q.   –2012?
> I asked Bret Ansel the same questions.  In terms of working as a reserve officer, were you able to think?  Before April 10, 2012, were you able to think and be detailed in doing your job at 911 Dispatch?
> A.   Yes.
>
> *                    *                    *
>
> Q.   Okay.  You had no problem concentrating?
> A.   No.
> Q.   Correct?
> A.   No.
> Q.   No, it's not correct?
> A.   No, I had no problem concentrating.
>
> *                    *                    *
>
> Q.   You were able to perform a full range of your responsibilities as the supervisor up to April 10, 2012?
> A.   Yes.

*See* Defs.' Mot., Ex. 4 at 50-52.  Therefore, Plaintiff has failed to provide sufficient evidence demonstrating he suffers from an impairment that substantially limits a major life activity.

To the extent Plaintiff seeks to establish he is disabled under the "regarded as" prong of the ADA, he has likewise failed to come forward with sufficient evidence suggesting that he was

terminated "because of an actual or perceived [] mental impairment . . . ." *Banaszak*, 2013 U.S. Dist. LEXIS 81671, at *12 n.7 (emphasis in original).[2]   The medical information that Frank and Armstrong had before terminating Plaintiff included: (1) the hospital's records diagnosing Plaintiff with a mood disorder, ineffective coping, a history of PTSD that was "subclinical" at the time and discharging him with no restrictions, (2) Dr. Rizzo's April 28, 2012 note stating that Plaintiff would be able to return to work "with no restrictions including law enforcement duties[,]" and (3) Dr. Casselman's report opining that Plaintiff was not disabled.   They did not have Plaintiff's medical records from Dr. Rizzo, nor Amber Lang's notes from the April 10, 2012 counseling session.

Frank also reviewed Plaintiff's April 17, 2012 email indicating that he did "not see any need for medical or disability[.]"   Additionally, Plaintiff informed Armstrong that he was willing and able to return to work in his post-interview letter.   Moreover, it should be noted that Plaintiff never requested an accommodation for his purported disability.   While Plaintiff's ADA claim is not premised on a failure to accommodate theory, this fact is still relevant to whether he was terminated "because of an actual or perceived impairment."

Based on this record it cannot be concluded that Plaintiff would not have been terminated "but for" his mental impairment of PTSD.   The discharge paperwork from the hospital does not connect Plaintiff's PTSD with his poor decision making on the night of April 10, 2012, rather the records suggest that his PTSD was subclinical at the time and that substance abuse, marital strain, acute work stress and ineffective coping were the contributing factors to his poor judgment and erratic behavior.   Moreover, none of the Defendant board members had access to Plaintiff's medical records.   Rather, all the Defendant board members voted to terminate Plaintiff based on Frank's

---

[2]   Plaintiff's Response fails to address Defendants' argument that he cannot demonstrate he was "regarded as" having a disability under the ADA.

-16-

recommendation that he could no longer trust his second in command to ensure the proper functioning of Central Dispatch in his absence.  The Defendant board members cannot be held accountable if they did not perceive Plaintiff as suffering from a mental impairment at the time they voted to terminate his employment.

While Plaintiff may argue that Frank knew of his mental impairment, thus liability may be imputed to Monroe County and Central Dispatch, the record does not support a theory that Frank regarded Plaintiff as having a disability.  Frank testified that "[i]n my opinion, there was–at no time in my mind was [Plaintiff] disabled, was he mentally impaired.  He functioned on a daily basis here and never brought to my attention or asked for any consideration in regard to a disability."  *See* Plf.'s Resp., Ex. 1 at 54.  Frank had no knowledge of Plaintiff's PTSD during his employment, and his review of the hospital records prior to the May 2012 board meeting would not have put him on notice that Plaintiff's PTSD was a contributing factor to Plaintiff's poor decision-making in April of 2012.   Frank was unaware that Plaintiff had been in treatment with Dr. Rizzo since 2011, nor was he provided with Plaintiff's medical records from Dr. Rizzo.  Rather, he only had a return to work slip indicating that Plaintiff was clear to return to work with no restrictions.  Moreover, Dr. Casselman's report indicated that she did not believe Plaintiff was disabled and that the episode in mid-April was likely an aberration.  Frank is not a doctor and he was entitled to rely on the doctors' professional opinions that Plaintiff was not disabled and that he could perform the duties of his position. These medical opinions, coupled with the fact that Plaintiff never put Frank on notice that he had a disability, rather he repeatedly asserted an ability to perform his job duties, establishes that no reasonable jury would conclude Defendants County and Central Dispatch, through Frank's actions, "regarded" Plaintiff as disabled.  Plaintiff's *prima facie* case likewise fails under the "regarded as" prong of the ADA because he cannot establish he would not have been terminated

"but for" his disability.

In any event, even if Plaintiff could establish his *prima facie* case, he has not shown Defendants' reason for terminating him was pretext for discrimination. If plaintiff proves a *prima facie* case, the burden of persuasion shifts to the employer to articulate some legitimate, nondiscriminatory reason for the employment decision. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 , 802 (1973). Once the employer carries this burden, the burden then shifts back to the plaintiff to prove by a preponderance of the evidence that the legitimate reasons offered by the employer were not its true reasons, but were a pretext for discrimination. *Id.*; *Ang v. Proctor & Gamble Co.*, 932 F.2d 540, 548 (6th Cir. 1991). The plaintiff may meet this burden by showing: 1) that the stated reasons had no basis in fact; 2) that the stated reasons were not the actual reasons; or 3) that the stated reasons were insufficient to explain the employer's action. *Wheeler v. McKinley Enters.*, 937 F.2d 1158, 1162 (6th Cir. 1991).

Here, the record evidence reveals that Plaintiff was terminated because of his improper and dangerous behavior on April 10, 2012 and April 11, 2012. He was also terminated for his failure to appear for scheduled radio training sessions, for which he was responsible, as well as for other acts supporting Frank's conclusion that his second in command's actions compromised the effective operation of Central Dispatch, as well as the perception of its effectiveness in the eyes of law enforcement personnel with which Central Dispatch has to work with for the welfare and safety of the Monroe County Community. Plaintiff has failed to rebut Monroe County's legitimate, non-discriminatory reason for terminating his employment. He has not shown that Monroe County's stated reason has no basis in fact, the stated reasons were not the actual reasons nor that the stated reasons were insufficient to explain the employer's actions.

Plaintiff argues that Crutchfield's April 17, 2012 email to Armstrong wherein he indicates

-18-

that "[m]yself and Director Frank are of the same opinion that [Plaintiff] cannot be allowed to return to his position" demonstrates there is a question of fact as to whether Defendants' stated reason for terminating Plaintiff was pretext for disability discrimination. However, at the time Crutchfield sent the email to Armstrong, none of Plaintiff's medical records had been supplied to Monroe County or any of its employees. There was simply nothing before Frank or Crutchfield that would suggest Plaintiff's behavior was attributable to a disability. Frank and Crutchfield had therefore reached the conclusion that Plaintiff could not return to work because his behavior had jeopardized the proper functioning of Central Dispatch and, at a minimum, violated Rules 3, 4 and 10 of Central Dispatch's Code of Conduct.

For the foregoing reasons, Plaintiff has not come forward with evidence demonstrating a material question of fact exists as to his disability discrimination claim under the ADA. Therefore, Defendants are entitled to judgment in their favor on this claim.

### 2.      Retaliation under the ADA

In order to establish a retaliation claim under the ADA, Plaintiff must demonstrate (1) he engaged in a protected activity; (2) his employer knew of the protected activity; (3) he suffered an adverse employment decision; and (4) there was a causal connection between the protected activity and the adverse employment decision. *Steward v. New Chrysler*, 415 F. App'x 632, 643-44 (6th Cir. Feb. 4, 2011).

This claim does not appear to be properly before the Court. Plaintiff has not exhausted his remedies with respect to this claim, which rests on his contention that Defendant Crutchfield met with the Chief of the Dundee Police Department, David Uhl, and persuaded Uhl to terminate Plaintiff's employment with the Dundee Police Department as a reserve police officer in October of 2012. Plaintiff filed his EEOC complaint in July of 2012 alleging disability discrimination

-19-

against Monroe County for terminating his employment as Assistant Director of Central Dispatch in May of 2012.

Plaintiff is required to file a charge with the EEOC and receive a right-to-sue letter prior to filing his claim.  A complaint is sufficient if it serves to "identify the parties[] and to describe generally the action or practices complained of."  29 C.F.R. § 1601.12(b).  This Court's jurisdiction is "limited to the scope of the EEOC investigation reasonably expected to grow out of the charge of discrimination."  *Ang*, 932 F.2d at 545.  Thus, Plaintiff's retaliation claim is not necessarily precluded if "it was reasonably within the scope of the charge filed."  *Davis v. Sodexho*, 157 F.3d 460, 463 (6th Cir. 1998) ("[W]here facts related with respect to the charged claim would prompt the EEOC to investigate a different, uncharged claim, the plaintiff is not precluded from bringing suit on that claim.").

The scope of the complaint must be construed liberally where the plaintiff is not assisted by counsel in drafting the complaint.  *Ang*, 932 F.2d at 546.  In making its determination, the district court must examine whether the "facts related with respect to the charged claim would prompt the EEOC to investigate a different, uncharged claim."  *Davis*, 157 F.3d at 463.  Plaintiff fails to address the exhaustion argument raised by Defendants.  Based on the applicable law and the record before this Court, it cannot be said that Plaintiff's retaliation claim involving a separate agency, the Dundee Police Department, would reasonably grow out of the EEOC's investigation into the complaint concerning his termination from Monroe County as Assistant Director of Central Dispatch.

Additionally, even if this claim were properly exhausted, Plaintiff has not come forward with any admissible evidence to warrant submitting this claim to the jury.  As an initial matter, there is no evidence in the record to suggest that Crutchfield or the Central Dispatch Board as a whole had any authority over Uhl's personnel decisions with respect to the Dundee Police Department.  In fact,

-20-

2:13-cv-13560-GAD-MKM   Doc # 36   Filed 11/25/14   Pg 21 of 23   Pg ID 543

it is Plaintiff's belief that the Central Dispatch Board has no authority over the personnel decisions of the Dundee Police Department. *See* Plf.'s Resp., Ex. 3 at 83.

Moreover, both Crutchfield and Uhl deny discussing Plaintiff between April of 2012 and October of 2012. *See* Defs.' Mot., Ex. 16 at 13, 15-16; Ex. 11 at 25-28. The fact that Uhl served as an alternate on the Board of Central Dispatch and attended one meeting in February of 2012 does not assist Plaintiff's claim. Moreover, Plaintiff's assertion that Ansel told him Crutchfield persuaded Uhl to terminate Plaintiff from the police department is not supported by Ansel's testimony, and it is inadmissable hearsay in any event. *See* Plf.'s Resp., Ex. 6 at 98-99, 145. Plaintiff has failed to come forward with "specific facts showing that there is a genuine issue for trial." *First Nat'l Bank*, 391 U.S. at 270; *see also McLean*, 224 F.3d at 800; *Anderson*, 477 U.S. at 248, 252. Defendants are entitled to judgment in their favor on Plaintiff's retaliation claim under the ADA.

### C.    Fourteenth Amendment Claim

"A person's reputation, good name, honor, and integrity are among the liberty interests protected by the due process clause of the fourteenth amendment." *Brown v. City of Niota*, 214 F.3d 718, 722 (6th Cir. 2000). "A deprivation of any of those interests must be accompanied by notice and an opportunity to be heard to refute any charges against that person." *Id*. (quotation marks omitted). In order to establish that a plaintiff was deprived of a liberty interest entitling him to a name-clearing hearing, the following elements must be established:

> First, the stigmatizing statements must be made in conjunction with the plaintiff's termination from employment . . . . Second, a plaintiff is not deprived of his liberty interest when the employer has alleged merely improper or inadequate performance, incompetence, neglect of duty or malfeasance . . . .Third, the stigmatizing statements or charges must be made public. Fourth, the plaintiff must claim that the charges made against him were false. Lastly, the public dissemination must have been voluntary.

-21-

*Id*.  In the employment arena, the deprivation of a protected liberty interest requires that a plaintiff show "stigmatizing governmental action which so negatively affects his or reputation that it effectively forecloses the opportunity to practice a chosen profession." *Joelson v. United States*, 86 F.3d 1413, 1420 (6th Cir. 1996).  "Liberty interests 'are not implicated . . . by allegations of improper or inadequate performance or, in some cases, by charges of incompetence, neglect of duty or malfeasance.  A charge that merely makes a plaintiff less attractive to other employers but leaves open a definite range of opportunity does not constitute a liberty deprivation.'" *Id*. at 1420-21 (quoting *Gregory v. Hunt*, 24 F.3d 781, 788 (6th Cir. 1994)).

Here, the record before the Court shows that the Defendants did not make any public statements that were detrimental to Plaintiff's reputation or that they made stigmatizing statements that have prevented Plaintiff from obtaining other opportunities.  Moreover, even if Plaintiff could demonstrate Frank's statements at the May 11, 2012 board meeting were "stigmatizing," he has not shown the statements were false.  *See Greer v. Detroit Public Schools*, 507 F. App'x 567 (6th Cir. Dec. 6, 2012); *see also Ferencz v. Hairston*, 119 F.3d 1244 (6th Cir. 1997) (noting "the Supreme Court has determined that where a nontenured employee shows he has been stigmatized by the voluntary, public dissemination of false information in the course of a decision to terminate his employment, the employer is required to afford him an opportunity to clear his name.") *Id*. at 1250 (citing *Codd v. Velger*, 429 U.S. 624, 627-28 (1977)).

The only statements Frank made during the May 2012 board meeting included Frank's "lack of trust and confidence" in Plaintiff as his second in command for Central Dispatch and his recommendation for termination for the best interest of the agency and the people it serves.  As such, even if Frank's statements could be characterized as "stigmatizing," there was nothing false about his statements.  Moreover, at the May 2012 board meeting, Plaintiff was offered an

opportunity to discuss the matter in a closed session, but declined to do so.  Plaintiff cannot establish the elements of this claim and Defendants are likewise entitled to judgment in their favor on Plaintiff's Fourteenth Amendment claim.

## IV.    CONCLUSION

Accordingly, for the reasons articulated above, Defendants' Motion for Summary Judgment[#27] is GRANTED.  This cause of action is dismissed.

SO ORDERED.

Dated: November 25, 2014                                   /s/Gershwin A Drain
                                                           GERSHWIN A. DRAIN
                                                           UNITED  STATES  DISTRICT  JUDGE